J-S35042-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.W.F., S.M.F. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.E.M., NATURAL | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 253 WDA 2017 |

Appeal from the Order Entered January 9, 2017
in the Court of Common Pleas of Cambria County
Orphans' Court at No(s):  2016-553 IVT,
2016-554 IVT

BEFORE:   LAZARUS, RANSOM, JJ., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                 **FILED JUNE 28, 2017**

Appellant, J.E.M. ("Father"), files this appeal from the Order dated January 6, 2017, and entered January 9, 2017,[1] in the Cambria County Court of Common Pleas granting the petition of the Cambria County Children and Youth Service (the "Agency") and involuntarily terminating his parental rights to his minor, dependent children, A.W.F., a male born in May of 2014,

_____

[*] Former Justice specially assigned to the Superior Court.

[1] While dated January 6, 2017, the order was not entered for purposes of Pa.R.C.P. 236(b) until January 9, 2017, upon provision of notice.  **See Frazier v. City of Philadelphia**, 557 Pa. 618, 621-22, 735 A.2d 113, 115 (1999) (holding that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given").  **See also** Pa.R.A.P. 108(a) (entry of an order is designated as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)").

and S.M.F., a female born in May of 2013 (collectively, the "Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[2] After review, we affirm the trial court's order.

The trial court summarized the relevant procedural and factual history, in part, as follows:

. . .

5. Mother and [Father] are parents to another child who lives with [Father]. [Father] and his paramour also have a child the approximate age of two who resides with [Father] and his paramour.[3] [The Agency] is not involved with [Father] concerning these two other children. The concerns of [the Agency] are directed toward [Father]'s ability to parent more than these two children. A representative of [the Agency] stated that it has no plans or grounds to remove or oversee these other two children living with [Father] and his paramour. This does not make sense to this [c]ourt given the reasons for termination.

6. The children had been removed from the care of [M]other and [L]egal [F]ather by emergency order of October 14, 2014.[4]

_____

[2] By the same Order, the trial court involuntarily terminated the parental rights of K.M.C. ("Mother") and H.L.F., Jr. ("Legal Father") with respect to the Children. Neither filed a separate appeal, and they are not parties to the instant appeal.

[3] Mother and Father's oldest child, H., not a subject of this matter, was six years old at the time of the hearing. Notes of Testimony ("N.T."), 9/28/16, at 17; N.T., 10/11/16, at 154. Father's other child, E., also not a subject of this matter, is two months younger than A.W.F. and was two years old at the time of the hearing. *Id.*

[4] Legal Father lived with Mother at the time of the Children's removal and the Children were held out as his children. However, it was not until after removal, when paternity testing was conducted, that it was determined that

*(Footnote Continued Next Page)*

There was no water in the home, the house was in a deplorable state, the children were filthy, and the house condemned. The family was homeless.

7. At the Permanency Review Hearing held on April 13, 2015, the Juvenile Court determined that there had been minimal compliance with the Permanency Plan, and that [M]other had attended most scheduled visits, however, she made no progress in housekeeping and had not enrolled in the court mandated parenting classes. Legal [F]ather had made only minimal compliance with the Permanency Plan, and neither parent had made other than minimal progress in alleviating the circumstances requiring placement of the [C]hildren[.]

8. At the Permanency Review Hearing held on August 17, 2015, it was determined that neither [M]other, [L]egal [F]ather nor [Father] had made any progress alleviating the circumstances which led to the placement, and that there had been no compliance with the Permanency Plan by any of the parties. Further, [M]other now failed to attend visits with the [C]hildren. The Juvenile Court ordered no further services to [M]other and [L]egal [F]ather, and the permanency goal concerning them was adoption. As to [Father], the placement goal became return to parent or guardian with a concurrent goal of adoption.

9. At the Permanency Review Hearing held on February 15, 2016, the Juvenile Court found that [Father] had moderate compliance with the Permanency Plan. [Father] was given three months of continued supervised visits to ascertain his ability to parent.

10. Dennis Kashurba, a licensed psychologist, performed evaluations of [Father] on May 13, 2015 and April 8, 2016. He also performed a psychological bonding study on February 3, 2016.

_(Footnote Continued)_ _____

Legal Father was not the Children's biological father. N.T., 9/28/16, at 5-6, 10, 13-14, 19-20; Exhibits 1 and 2. Nevertheless, there was testimony as to prior knowledge that Legal Father was not S.M.F.'s biological father. N.T., 9/28/16, at 20; N.T., 10/11/16, at 167.

. . .

12. In his summary of the May 13, 2015 evaluation, Mr. Kashurba found that [Father] had a "signigicant degree of cognitive limitation" with a full scale IQ of "70."

Mr. Kashurba further stated:

"[Father]'s paramour appeared to express more affection toward [Father]'s two children than did he. There was no separation anxiety displayed by either of [Father]'s children at the end of the visit when they were returned to the foster mom for transportation to the foster home."

13. In his recommendations Mr. Kashurba stated:

"Continued supervised visitation at [the Agency] office appears to be the most appropriate level of interaction between [Father] and two young children, [S.M.F. and A.W.F.] It does not appear that [Father] has the intellectual ability to learn and independently implement parenting strategies for [the Children] within the foreseeable future that would warrant consideration as a primary placement option for these children. Thus, continued foster care does appear to be in the [C]hildren's best interests. In the event that hands-on parenting training were to be implemented as a means of obtaining summative evaluation of the developing parenting skills of [Father]'s paramour, it is recommended that this be undertaken within the confines of a setting that would include [H.], who was not present for today's visit. This type of observation and skills training would afford the opportunity for a parent trainer to provide the [c]ourt with ongoing input regarding the ability of [Father] and his paramour to multitask, as would be necessary in the circumstances associated with parenting four children, three of whom are two years of age and younger."

14. Following Mr. Kashurba's recommendation, Professional Family Care Services were provided to [Father]. The following goals were established:

"1. Father will properly supervise all children during visits.

2. Father will gain insight to the [C]hildren's development."

The results were as follows (see Petitioner Exhibit 15):

A.    October 2, 2015 – "During these visits, [Father] managed to supervise the children and keep them safe.  He spent time engaging in play and made efforts to manage his time with each of them.  [Father] comforted [A.W.F.] when he was upset, encouraged the children to use 'please' and [']thank you[,'] encouraged them to share toys and tried teaching them new things by talking about colors and shapes.  [Father] seems to understand that staying engaged and playing with the children will make the visit more enjoyable and less stressful.  He has been receptive of me and made an effort with suggestions given to him during visits.  At times [Father] can get overwhelmed while supervising the children, but he has been able to manage them with some help from [A.B.]"

B.    October 28, 2015 – "When [Father] attended visits without [A.B.], it was clearly more difficult for him to supervise the children and ensure their safety.   At times [E.] was not being closely watched and she put small toys in her mouth. This concern was addressed with [Father] and the preventive recommendations were discussed.  [Father] made efforts to give [S.M.F.] and [A.W.F.] his attention along with his other children that participated in the visits.   He was made aware that he needs to make efforts to spend more time and bond with [A.W.F.], as during one visit he only had brief interactions with him. [Father] acknowledges issues brought to his attention that could be improved upon.  There are times of stress during visits, especially when [Father] is caring for children on his own."

C.    November 30, 2015 – "[Father] continues to have some difficulty with proper supervision and safety of the children.   [A.W.F.] was left sitting alone at a table and fell off the chair.  This concern was addressed with [Father] and preventative recommendations were discussed.  Once identified, [Father] demonstrated an

ability to better monitor the children. To increase their safety, he stayed close to [A.W.F.] as he was at the table, made sure the children were sitting properly on their chairs, and kept the chairs pushed in while they sat at the table. During the visit [A.W.F.] was hitting [E.] with a toy and [Father] did not acknowledge the behavior. [Father] followed through with suggestions made to acknowledge when [A.W.F.] is hitting another child and to set limits with his behavior. He demonstrated an understanding of setting limits with [A.W.F.]'s behavior by enforcing the recommendation at a following visit without needing to be reminded. [Father] was unaware that it is unsafe for the children to consume raw cookie dough due to the possibility of contracting salmonella. He was also unaware that he has a malfunctioning carbon monoxide detecter [sic]. He was strongly encouraged to get it fixed. . . [.] [Father] is receptive to recommendations and suggestions given to him and participates in the pre and post visit discussions. He acknowledges issues brought to his attention and makes an effort to correct them in the visits that follow. He has shown improvement with his ability to read the children's cues and be attentive to their needs."

D.     December 30, 2015 – "[Father] has not been making much of an effort to continue [b]onding with [A.W.F.] as he had been during previous visits. He has given [A.W.F.] one-on-one play time at visits and brought him toys, but he does not show affection. This has been addressed with [Father] at the most recent visit and he acknowledge[s] the suggestions made. Although [Father] is constantly with the children showing that he will monitor their safety, it appears that he slows down or becomes less motivated to engage with them as the visit goes on. Towards the end of the visit, he is typically observing them as they play rather than playing along with them. It was noted that during a visit at [the Agency] with the caseworker supervising [Father] did not spend time engaging in play with the children but instead followed them around as they played. . . [.] Even though [Father] has been able to observe the children and provide lunch during visits, there are concerns that he would not be able to manage caring for the children on his own if were on a

full-time basis. There are also concerns that he does not make continual effort to bond with the children during visits."

E.    February 4, 2016 – "[Father] has been able to follow most recommendations made to him. There have been suggestions which he did not follow or only followed through at the subsequent visit and then did not continue thereafter. [Father] observes the children closely throughout the visits, but he still encountered incidents of potential harm and unsafe situations. He spends the entire duration of visit with [S.M.F.] and [A.W.F.], but his interactions are not fully engaging or with affection. [Father] seems to care about the well-being of the children and makes efforts to ensure they are safe. There are concerns that it would be difficult for him to manage all of the children on a regular basis. [Father] has not demonstrated the desire or ability to bond with [S.M.F.] and [A.W.F.]"

F.    February 29, 2016 – "[Father] appeared overwhelmed while the children were not compliant during clean up time. He spends the majority of play time following the children's lead rather than being the leader and engaging in activities. Although he continues to make efforts to engage with the children and keep them safe during visits, there continues to be concerns that he would not be able to manage daily tasks on regular basis while supervising the children."

G.    April 4, 2016 – "[Father] continues to follow recommendations made to him, although it is not always with consistency. [Father] appeared overwhelmed when he took all three children out of the home setting by himself. He continues to spend the majority of play time following the children's lead rather than being the leader and engaging them in activities. He makes efforts to have [the] children use more words to express themselves and communicate their needs. Although he continues to make efforts to engage with the children and keep them safe during visits, there continues to be concerns that he would not be able to manage daily tasks on a regular basis while supervising the children."

H.    April 22, 2016 – "While [Father] has recently began to say 'I love you' to the [C]hildren after certain visits, he does not consistently demonstrate the

desire or ability to show continued affection with [the Children] and has not been nurturing toward the [C]hildren beyond the suggestions made to him. He will prompt hugs at the beginning and end of visits, but typically only gives random high fives throughout the duration of the two hour visit."

I. April 27, 2016 – "Until the most recent visit, he typically only gives random high fives throughout visit and hugs only at the beginning or end of visit. Although he continues to make efforts to engage with the children and keep them safe during visits, there continues to be concerns that he would not be able to manage daily tasks on a regular basis while supervising the children."[5]

15. In his February 3, 2016 Psychological Bonding Evaluation, Mr. Kashurba stated that:

"The purpose of the evaluation was to gather information pertinent to ascertaining the level of bond between [Father] and the two children in order to determine whether he should be considered as a potential placement option for these two children who are currently in foster care placement."

The report, Petitioner Exhibit 14, goes on to state that:

"A primary concern for [the Agency] regarding [Father] being considered as a potential placement option for the two children is that [Father] is a founded perpetrator of physical abuse toward the then 5-year-old daughter to his current paramour."

Mr. Kashurba goes on to say that:

_____

[5] One or both of Father's two other children, H. and E., were also present at visits, including those which continued at the Agency following the inception of visitation coaching. N.T., 9/28/16, at 41-42, 51; N.T., 10/11/16, at 69-70. *See also* Exhibits 15 and 16. Subsequent to the commencement of visitation, however, Father's paramour, A.B., with whom he resided, was excluded from visitation due to concerns as to the permanency of the relationship. *Id.* at 61-62; 56.

"It was difficult to assess the degree of affection between [Father] and the [C]hildren since there was such a whirlwind of activity."

However, he also states:

"In fact, both [S.M.F.] and [A.W.F.] appeared to display a stronger emotional bond with the bio mom's paramour than with either of the biological parents. . . [.] Overall, there did not appear to be an emotional bond between either [S.M.F.] or [A.W.F.] to [Father] that would suggest that permanency through adoption would be deleterious to either of them. It also appears that the amount of progress that [Father] has made in the parenting domain has been insufficient to suggest that he is likely to develop independent parenting skills to a degree that will enable him to be considered as a primary caregiver for [the Children] in the foreseeable future."

16. In his April 8, 2016 evaluation, Dr. Kashurba stated that:

"The purpose of the evaluation was to update information pertinent to ascertaining [Father]'s cognitive level of functioning as this relates to his ability to be considered as a potential placement option for two of his children who are currently in foster care."

He goes on to state:

"It was this examiner's opinion that, based upon the results of the initial psychological evaluation as well as the bonding study, [Father] would not be able to develop the ability to independently parent [the Children] in the foreseeable future due to his cognitive limitations as well as his current responsibility for managing two children who presently reside in the home ([H.] and [E.])."

Trial Court Order, filed 1/9/17, at 1-11.

On June 7, 2016, the Agency filed a petition to involuntarily terminate Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). Thereafter, the Agency filed an amended petition on August 30, 2016.[6] The trial court conducted hearings on the termination petition on September 28, 2016, and on October 11, 2016, at which time the Agency presented the testimony of the following: Carol Crouse, Agency caseworker; Dennis Kashurba, licensed psychologist who conducted psychological evaluations of Father on May 13, 2015, and on April 8, 2016, and a bonding evaluation on February 3, 2016, with respect to Father and the Children;[7] Molly Humphrey, family support specialist with Professional Family Care Services; and Sarah Sherry, family support program supervisor and licensed social worker with Professional Family Care Services. Father presented the testimony of A.B., Father's paramour; C.H., Father's mother; C.M., Father's brother; and C.L., Father's sister. In addition, Father testified on his own behalf. Legal Father, who was present and represented by counsel on September 28th, also testified and expressed his desire to consent to the termination of his parental rights to the Children. N.T., 9/28/16, at 5-10.

_____

[6] The petition was amended to include Legal Father in the caption. N.T., 9/28/16, at 12.

[7] Mr. Kashurba's psychological evaluations of Father were marked and admitted collectively as Exhibit 13, and his bonding evaluation of Father and the Children was marked and admitted as Exhibit 14. *See* Exhibits 13 and 14. Mr. Kashurba additionally conducted psychological evaluations of Mother and Legal Father. *See* Exhibits 11 and 12.

Mother, who did not appear on September 28th, was present on October 11th *pro se*. She did not present any evidence. N.T., 10/11/16, at 182.

Following the hearings and subsequent to the submission of memoranda, by Order dated January 6, 2017, and entered January 9, 2017, the trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b).[8] On February 6, 2017, Father, through counsel, filed a notice of appeal, along with a concise statement of errors appointed complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court entered an Order on February 14,

_____

[8] The guardian *ad litem*, Christopher G. Gvozdich, Esquire, submitted a brief in support of the termination of Father's parental rights. **See** Guardian *ad litem's* Brief. We note here that in a divided decision our Supreme Court recently held in **In re Adoption of L.B.M.**, 2017 WL 2257203, at * 5 (Pa. March 28, 2017) that 23 Pa.C.S.A. § 2313(a) requires a trial court to appoint counsel for a child in contested involuntary termination of parental rights proceedings. Authoring Justice Wecht, joined by Justices Donohue and Dougherty, sought to hold that a trial court is required to appoint separate, independent counsel to represent a child's legal interests even where the guardian *ad litem* is an attorney. However, Chief Justice Saylor, as well as Justices Baer, Todd, and Mundy, disagreed in separate concurring and dissenting writings. In sum, the latter four Justices agreed that the trial court must appoint counsel to represent a child in all contested involuntary termination hearings, but they did not join that portion of Justice Wecht's Opinion that sought to hold a guardian *ad litem* never may serve as the child's counsel. Herein, Father did not raise before the trial court any concerns which would have created a need to appoint independent counsel to advocate for the Children, nor does he make any claims on appeal that the guardian *ad litem* did not properly represent the Children's legal and best interests due to a conflict of interest. Indeed, in this case, Attorney Gvozdich zealously represented the Children.

- 11 -

2017, pursuant to which it relied upon its Order entered on January 9, 2017, and did not issue an additional or subsequent opinion.[9]

On appeal, Father raises the following issues for our review:

1.  Whether the trial court properly considered the evidence that [ ]Father was appropriately caring for two children not subject to the present action in making the determination that the [A]gency met its burden to involuntarily terminate his parental rights in the present case.

2.  Whether the [Agency] had met its burden of terminating Father's parental rights by clear and convincing evidence.

Father's Brief at 2.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

---

[9] Although not captioned or docketed as such, the trial court referred to its January 9th order as an opinion and order.

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

- 13 -

conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M., II*, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8), as well as (b).[10] Nonetheless, "w[e] . . . may uphold a decision below if there exists *any* proper basis for the result reached." *Weber v. Lynch,* 346 A.2d 363, 366 n. 6 (Pa.Super. 1975), *affirmed*, 375 A.2d 1278 (Pa. 1977) (citing *Hayes v. Wella Corp*., 309 A.2d 817 (Pa.Super. 1973)). Further, we have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re B.L.W.,* 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*.

While he failed specifically to identify Subsections (a) and/or (b), Father generally challenges the sufficiency of the evidence in terminating his parental rights.[11] However, Father presents argument only related to

_____

[10] We disagree with the trial court as to the application of Section 2511(a)(5) and (8), as the Children were not removed from Father's care. *See In re C.S.*, 761 A.2d at 1200 n.5. *See also In re Z.P.*, 994 A.2d 1108, 1121, 1123 n.3 (Pa.Super. 2010.)

[11] While broadly expressed in his concise statement and statement of questions involved, Father raises a challenge to the sufficiency of the evidence. *See Commonwealth v. Laboy*, 594 Pa. 411, 415, 936 A.2d

*(Footnote Continued Next Page)*

Subsections 2511(a)(1) and (b).[12]  Father failed to present argument related

to Subsections 2511(a)(2), (5), and (8) in his appellate brief.  As such, we

find that Father has waived any claim regarding these subsections.  ***See In***

***re W.H.***, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 24 A.3d

364 (Pa. 2011) (quoting ***In re A.C.***, 991 A.2d 884, 897 (Pa.Super. 2010))

("[W]here an appellate brief fails to provide any discussion of a claim with

citation to relevant authority or fails to develop the issue in any other

meaningful fashion capable of review, that claim is waived.").

We, therefore, analyze the court's decision to terminate under

Subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

*(Footnote Continued)* ————————————————

1058, 1060 (2007) (holding that this Court erred in determining that the appellant had failed to adequately develop, in his Rule 1925(b) statement, the claim that the evidence was insufficient to support his conviction).

[12] While Father does not expressly present argument with regard to Section 2511(b), he does present discussion and opposition as to the bonding evaluation which we consider as a challenge pursuant to Section 2511(b). ***Id.***

. . .

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. §§ 2511(a)(2), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met:  (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted).  "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct.  To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties."  *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).

In the instant matter, in finding the Agency had established a basis for terminating Father's parental rights pursuant to Section 2511(a)(2), as well as (a)(1), (5), and (8), the trial court relied upon the evaluations of Dennis Kashurba, which noted Father's cognitive limitations and need to care for two other children resulted in his inability to develop the skills to parent independently the Children, as well as the observations of Professional Family Care Services made during visitations between Father and the Children. *Id.* at ¶¶12-16. Significantly, as it relates to Father's care for his other two children, the trial court acknowledged, "A representative of [the Agency] stated that it has no plans or grounds to remove or oversee these other two children living with [Father] and his paramour. This does not make sense to this [c]ourt given the reasons for termination." *Id.* at ¶5.

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Mr. Kashurba, who performed two psychological evaluations of Father as well as a bonding evaluation of Father and the Children, opined that Father evidenced "cognitive deficiency" to the extent "that he should not be considered as a placement option" for the Children. N.T., 10/11/16, at 10. With the two children Father already had in his care, Mr. Kashurba did not believe Father possessed "adequate intellectual ability and insight" to parent two additional children. *Id.* at 11. Mr. Kashurba further expressed that Father does not have "the intellectual ability to learn and independently implement parenting strategies within the foreseeable future." *Id.* He noted that Father "had

- 17 -

limited ability to anticipate potential hazards" and/or "potential consequences with children's behaviors as to avoid dangerous outcomes." *Id.* at 19-20. Notably, Mr. Kashurba also recognized that Father was an indicated perpetrator of physical abuse of the older child of his paramour who had been removed from the home. *Id.* at 11, 35. As a result, he opined that continued foster care was in the Children's best interest. *Id.* at 21. Significantly, subsequent to his second psychological evaluation, Mr. Kashurba remained of the opinion that Father's cognitive limitations prevented him from being considered as a placement option for the Children. *Id.* at 16. *See also* Exhibits 13 and 14.

Further, Agency caseworker Carol Crouse testified that Father is not able to "demonstrate an ability to parent the [C]hildren." N.T., 9/28/16, at 25. She stated, "Although he is very pleasant for the majority of the time, it appears that he is very easily overwhelmed. He is very easily distracted and he does appear to be cognitively limited." *Id.* at 25-26. Ms. Crouse, who supervised a monthly visit at the Agency,[13] *id.* at 27, 41, 62, described, "I would see [Father] being easily distracted. There were times that the children would be doing their own thing, wandering around the room. [Father] was unable to watch all of them. He seemed easily overwhelmed

---

[13] Ms. Crouse indicated that these monthly visits at the Agency continued even after visitation coaching services commenced. *Id.* at 27, 61.

by the prospect of having all of the children, and that was only in the confines of an hour visit in the visit room with a closed door."[14] *Id.* at 27-28. She testified that she was therefore in favor of the goal change to adoption.[15] *Id.* at 27.

Similarly, Molly Humphrey and Sarah Sherry, who were involved with the visitation coaching services provided by Professional Family Care Services, expressed concerns based upon their interactions with and observations of Father's visitation with the Children.[16] In their assessment, Father failed to demonstrate progress with respect to properly supervising all of the children and gaining insight into the Children's development. N.T., 10/11/16, at 50-51, 79, 100-02. Ms. Humphrey testified to continuing safety concerns and Father's need to exert more of an effort to bond with the Children. *Id.* at 51-56, 76. She acknowledged "an overall lack of understanding in. . . the ability to understand what it takes to parent [the C]hildren effectively and safely." *Id.* at 91. As a result, both supported

_____

[14] As indicated, one or both of Father's two other children, H. and E., were also present at visits. N.T., 9/28/16, at 41-42, 51; N.T., 10/11/16, at 69-70. *See also* Exhibits 15 and 16.

[15] As it relates to Father, the trial court changed the Children's placement goal to adoption on May 16, 2016. N.T., 9/28/16, at 26; Exhibit 6 at 2, 5-6. *See also* Exhibit 8.

[16] As explained by Ms. Humphrey, the visitation coaching entailed both observation and interaction, as well as suggestion. N.T., 10/11/16, at 71-72.

and/or indicated that it would be in the Children's best interest for their goal to be changed to adoption. *Id.* at 57, 103-04.

As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M.*

> *a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. 602, 628-29, 71 A.3d 251, 267 (2013). "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1108, 1121 (Pa.Super. 2010) (internal citations omitted).

Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in reasoning that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated, "There does not presently exist any meaningful bond between . . . [Father] with either of these children." Further, [i]n terminating the parental rights of these parents, this [c]ourt has found that this will best meet the developmental, physical, and emotional needs and welfare of the [C]hildren." Trial Court Order, filed 1/9/16, at ¶¶ 19, 20.

Father, however, challenges the bonding evaluation. Father's Brief at 10-11. Father indicates that in the report there is only one comment related to his bond with the Children. *Id.* at 10. He also argues that the evaluation "unfairly" makes a comparison to Mother and her paramour. *Id.* at 11. He states:

> It should be pointed out in this regard that, when said assessment was done, [M]other's paramour had no relationship to the [C]hildren but was permitted to attend. Father's paramour was not permitted to attend. Moreover, when [M]other and her paramour were being evaluated, there were two adults and two children. When Father was being evaluated, there was one adult and three children. Clearly, the circumstances of the two evaluations were different and not comparable.

*Id.* Lastly, Father maintains that the Agency should have utilized another evaluator, as he posits that Mr. Kashurba had a "predetermined mindset that

Father could not successfully parent more than one child" and "utilized the bonding evaluation to underscore his earlier finding as opposed to doing an evaluation as to the [C]hildren's relationship and bond to Father." *Id.* Again, we disagree.

Here, the record likewise corroborates the trial court's termination orders pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination as to the Children's needs and to the existence of a bond between Father and the Children that, if severed, would not have a detrimental impact on them. Specifically, Ms. Crouse recognized difficulties with the Children's visits with Father, in particular regarding A.W.F. She indicated, "There is a lot of tears, there is a lot of crying, reaching for the foster mother. He has a very difficult time making the transition from going from the foster family to anybody else." N.T., 9/28/16, at 36-37. Further, while acknowledging that S.M.F. was "comfortable" with Father, she indicated a lack of a bond between Father and both children. *Id.* at 33, 36. She stated that A.W.F. "recognizes [Father] as someone that he sees occasionally at [the Agency] that he spends some time with and then he goes back to the foster parents." *Id.* at 36.

Similarly, Mr. Kashurba, as well as Ms. Humphrey and Ms. Sherry, also confirmed the lack of a bond between Father and the Children. N.T., 10/11/16, at 21, 51-52, 57, 102-03. Notably, Mr. Kashurba offered, "[M]y impression was that there did not appear to be an emotional bond between

- 23 -

either [child] to [Father], that would suggest that permanency through adoption would be deleterious to either of them." *Id.* at 21. He further stated, "I didn't observe what appeared to be a parent/child bond on either of those children toward [Father]. I had more the impression that they were interacting in a play area, where they perhaps at a playground they see a certain neighbor on a frequent or infrequent basis and so they are comfortable enough doing whatever they want to do." *Id.* at 32.

Moreover, and more importantly, the Children, who are placed together, are doing well in their foster placement, where they have been placed since removal and commitment, and have formed a positive relationship with their foster family. N.T., 9/28/16, at 34-36. As reported by Ms. Crouse, "[S.M.F.] is doing fantastic in her placement. Her speech is improving dramatically. She does very well with potty training. She can follow directives. She engages others in play with her. She is wonderful." *Id.* at 34. Ms. Crouse further noted positive changes in that S.M.F. is no longer "parentified." *Id.* "She is no longer her brother's mother. She is his sister." *Id.* Ms. Crouse also described a "very strong bond" between S.M.F. and her foster parents. *Id.* at 35. Likewise, as to A.W.F., Ms. Crouse stated, "He does fantastic in the foster family. He is a very bright little boy. He is working on potty training. He is very attached to the foster mother. He would look out the window and yell for mommy. He is very attached to the siblings who are the children of the foster parents. He does very well in that setting." *Id.* at 36.

Lastly, and significantly, as indicated above, Ms. Humphrey expressed that Father has "an overall lack of understanding in. . . the ability to understand what it takes to parent [the C]hildren effectively and safely." N.T., 10/11/16, at 91. As such, referencing the length of time the Children have been in care and the inability to provide "a safe and stable home," despite the provision of services, Ms. Crouse opined that it is "in best interests of [the Children] if parental rights terminated and these children would be permitted to move on and achieve permanency through adoption." N.T., 9/28/16, at 37-38. **See also** Exhibit 10. In addition, she agreed that "severing any potential bond would promote needs and welfare of [C]hildren." **Id.** at 38. Ms. Crouse explained, the Children "need to be given the opportunity to achieve permanency and to have a home where they know that's where they are going to stay and they are not going to have to go visit other people and go into strange offices, that they're going to have a family that is always going to be there for them." **Id.** Further, Mr. Kashurba expressed that "removal from their present foster care setting would be more deleterious to the [C]hildren than would severing the bond with [Father] for adoption as recommended by [the Agency]." N.T., 10/11/16, at 16.

Thus, as confirmed by the record, termination of Father's parental rights serves Children's developmental, physical, and emotional needs and welfare. While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination

of parental rights. ***In re Z.P.***, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." ***Id.*** at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856 (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/28/2017